Susan Cholvin, Petitioner-Appellant,

v.

Wisconsin Department of Health
and Family Services, Respondent-Respondent.

Court of Appeals

*No. 2007AP1350. Submitted on briefs February 8, 2008.
—Decided July 24, 2008.*

**2008 WI App 127**

(Also reported in 758 N.W.2d 118.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Mitchell Hagopian* of *Madison* for Disability Rights Wisconsin.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Maureen McGlynn Flanagan*, Assistant Attorney General, and *J.B. Van Hollen*, Attorney General.

A nonparty brief was filed on behalf of Legal Aid Society of Milwaukee, Legal Action of Wisconsin and Alzheimer's Association of Southeastern Wisconsin by Paula K. Lorant of Milwauke, Harold M. Menendez of Madison, and Thomas Hlavacek of Milwaukee.

Before Dykman, Vergeront and Bridge, JJ.

¶ 1. BRIDGE, J. Susan Cholvin appeals a circuit court order affirming the decision of the Wisconsin Department of Health and Family Services (DHFS), which upheld a decision by the Rock County Department of Social Services terminating Cholvin's eligibility for home and community-based long term care services through the Community Options Program-Waiver/Community Integration Program-II (COP-W/CIP-II), a benefit of the Wisconsin Medicaid program. Cholvin challenges a written instruction given to county workers, otherwise referred to as screeners, for use in determining applicants' functional eligibility to participate in the program. The instruction directs that a "0" value should be entered on a screening form if an applicant experiences a limitation to his or her functional abilities less than one-third of the time. Cholvin contends that this instruction is a rule within the meaning of WIS. STAT. § 227.01(13) (2005–06),[1] and must be promulgated as such pursuant to WIS. STAT. § 227.10. Because it was not, Cholvin argues that the instruction is invalid. We agree, and reverse and remand the matter for a

_____

[1] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

determination of Cholvin's eligibility without the use of the challenged instruction.

## BACKGROUND

¶ 2. In order to understand the circumstances of this case, it is helpful to review the way in which COP-W/CIP-II operates. Accordingly, before addressing the specific facts of this case, we will provide a brief summary of COP-W/CIP-II.

### Community Options Program-Waiver/ Community Integration Program-II

¶ 3. COP-W/CIP-II is a Medicaid waiver[2] program under which individuals with disabilities and the elderly, who would otherwise qualify for Medicaid institutional care, are instead permitted to receive services in a home or community setting. *See* 42 U.S.C. § 1396n(c)(1).

¶ 4. The services available under COP-W/CIP-II are comprehensive, largely nonmedical support services that are designed to make it possible for disabled or elderly people to continue to live in their home communities despite suffering from disability or long term illness. *Id.*; 42 C.F.R. 440.180(b). In order to qualify for federal reimbursement for these services, states must demonstrate that "there has been a determination that

---

[2] The term "waiver" derives from the fact that the federal government, in approving a proposed state program, waives what are otherwise mandatory requirements of Medicaid law. *See* 42 U.S.C. § 1396n(c)(3). Waivers are granted by the Secretary of the Department of Health and Human Services to allow states to include as medical assistance under Medicaid the cost of home or community based services which would otherwise be provided in a nursing home setting. *Id.*

but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility . . . ." *Id.; see also* 42 C.F.R. §§ 435.217 and 441.301(b)(iii).

¶ 5. The Wisconsin statutes authorizing COP-W/CIP-II echo the federal requirement.[3] Pursuant to WIS. STAT. § 49.45(6m)(i), there are three levels of nursing care that are reimbursable by Medicaid, and therefore are the levels available to participants in COP-W/CIP-II. The levels are: skilled, intermediate and limited levels of nursing care.[4] Only the lowest or "limited" level of nursing care, meaning simple nursing care, is directly relevant to our review in this case.[5]

¶ 6. To determine whether an individual who is not presently residing in a nursing home qualifies for

---

[3] *See, e.g.,* WIS. STAT. § 46.27(11)(am); and WIS. STAT. § 46.277(2), which authorizes DHFS to seek a federal waiver to serve "medical assistance recipients, who meet the level of care requirements for medical assistance reimbursement in a skilled nursing facility or an intermediate care facility, in their communities by providing home or community-based services as part of medical assistance."

[4] WISCONSIN LONG TERM CARE FUNCTIONAL SCREEN INSTRUCTIONS § 1.2 provided to county workers who screen applicants states that there are four levels of nursing home care: (1) intermediate care—lowest needs; (2) ICF level 1—moderate needs; (3) skilled—high needs; and (4) intensive skilled—highest needs.

[5] According to WIS. ADMIN. CODE § HFS 132.13(12):

"Limited nursing care" means simple nursing care procedures required by residents with long-term illnesses or disabilities in order to maintain stability and which can be provided safely only by or under the supervision of a person no less skilled than a licensed practical nurse who works under the direction of a registered nurse. Supervision of the physical, emotional, social and rehabilitative needs of the resident is the responsibility of the appropriate health care provider serving under the direction of a physician.

any of the various levels of care, DHFS utilizes a long term care functional screen (functional screen) as an assessment tool. The functional screen is designed to evaluate a person's functional capacity to engage in activities necessary to live independently. A functional screen is required to establish eligibility prior to receiving services in the first instance, and additional functional screens are required annually thereafter to determine continued qualification under the program. *See* WISCONSIN LONG TERM CARE FUNCTIONAL SCREEN INSTRUCTIONS § 1.8.

¶ 7. For most of the existence of COP-W/CIP-II, a county case manager completed the functional screen manually and determined whether an individual met a requisite level of care. However, the process for completing the functional screen has evolved over time and is presently based on a face-to-face interview conducted by certified screeners. The functional screen is then scored by the use of a specially designed computer program. Additional facts regarding COP-W/CIP-II that are material to our disposition of this appeal are referenced below.

### Factual History

¶ 8. The following facts are undisputed. Cholvin, a resident of Rock County, has multiple sclerosis[6] and urinary disorders. She asserts that her disability is progressive in nature. Cholvin has shown indications of decreased short term memory, cannot do household chores or laundry, and cannot make her own meals. The administrative law judge (ALJ) who heard Cholvin's appeal found that Cholvin is not disabled cognitively,

---

[6] Multiple sclerosis is a progressive neurological disease. *Trott v. Wisconsin Dept. of Health & Family Servs.*, 2001 WI App 68, ¶ 2, 242 Wis. 2d 397, 626 N.W.2d 48.

and is independent in her use of a catheter for urine elimination, in bathing through the use of grab bars, in dressing, and in eating. The ALJ found that she is able to walk by relying on furniture and a walker. The ALJ further found that she is able to rise from a sitting position, and is basically independent when provided with medication, financial management, and transportation.

¶ 9. Until the county action giving rise to this appeal, Cholvin was a recipient of services under COP-W/CIP-II. She was initially found eligible for the "intermediate" level of nursing care following the manual completion of a functional screen. In April 2005, Cholvin participated in a computer-based annual functional screen. At that time it was determined that she was eligible for the "limited" level of nursing care. The annual functional screen which gives rise to the present appeal was administered in January 2006, again using the computer-based screen. This time, the screen resulted in a determination that Cholvin was not eligible for any level of nursing care. Cholvin was notified that her eligibility for benefits under COP-W/CIP-II would end on January 30, 2006, because she no longer required a level of care qualifying her for the program. Cholvin appealed. The ALJ, whose ruling served as the final determination of DHFS, *see* Wis. Admin. Code § HA 3.09(9), upheld the termination of Cholvin's benefits. Cholvin requested a rehearing before the ALJ, which was denied.

¶ 10. Cholvin sought review with the Rock County Circuit Court, which affirmed the decision of the ALJ. The court determined that there was substantial evidence in the record to support the decisions of the County and the ALJ. The court further found that the instruction challenged by Cholvin does not constitute a

rule and thus, did not need to be promulgated as such. Cholvin now appeals to this court.

## STANDARD OF REVIEW

¶ 11. When an appeal is taken from a circuit court order reviewing a decision of an administrative agency, it is the decision of the agency, rather than the decision of the circuit court, which is reviewed. *Hilton v. DNR*, 2006 WI 84, ¶ 15, 293 Wis. 2d 1, 717 N.W.2d 166. "Whether an agency's action constitutes a 'rule' under Wis. Stat. § 227.01(13) presents a question of law, which we review de novo." *Homeward Bound Servs., Inc. v. Office of the Ins. Comm'r*, 2006 WI App 208, ¶ 27, 296 Wis. 2d 481, 724 N.W.2d 380.

## DISCUSSION

¶ 12. Cholvin asserts that although the disease from which she suffers is progressive, the 2005 and 2006 computer-based functional screens resulted in "wildly different assessments" of her functionality. She does not attack the use of the functional screen generally, nor does she take issue with its validity and reliability for determining the levels of need required for purposes of Medicaid waiver eligibility. Instead, Cholvin takes issue with, and attributes the difference in scoring to, a new instruction which DHFS put in place as a guide for completing the functional screen.

¶ 13. The new instruction to which Cholvin objects, WISCONSIN LONG TERM CARE FUNCTIONAL SCREEN INSTRUCTIONS § 1.12D, was put in place by DHFS on February 28, 2005. The instruction is entitled "Abilities Fluctuate," and it relates to the manner in which an

756

individual's functional need for help in performing certain activities is entered on the online screening form when the individual's abilities fluctuate over time.

¶ 14. It is helpful to first describe the context in which this instruction is put to use. The functional screen contains an inventory of needs, or list of activities, that people need to perform, or have performed for them, in the course of every-day life. An individual's eligibility determination is based on the frequency of the individual's need for assistance in accomplishing those activities. The functional screen characterizes these activities as either "Activities of Daily Living" (ADLs) or "Instrumental Activities of Daily Living" (IADLs). There are six ADLs and six IADLs listed on the online screening form. ADLs include bathing, dressing, eating, mobility in home, toileting and transferring. IADLs include meal preparation, medication management and administration, money management, laundry and chores, telephone usage, transportation and employment.

¶ 15. For each ADL and IADL, the screener, a qualified administrator of the test, subjectively decides what level of assistance the person requires. If the person "is independent in completing the activity safely," the screener enters "0" next to the activity on an online form. If the person needs help, but the helper does not have to be physically present throughout the task, the screener enters "1." If the person needs help and the helper needs to be present throughout the task, the screener enters "2." The ultimate decision as to whether the entered information meets a level of care is determined by operation of a computer program, rather than by an individual. *See* WISCONSIN LONG TERM FUNCTIONAL SCREEN INSTRUCTIONS § 1.2.

757

¶ 16. The instruction at issue, § 1.12D, has to do with the frequency of the need for assistance with ADLs and IADLs and the effect that frequency has on the way the functional screen is completed. In essence, it establishes a policy under which screeners are to enter a "0," "1," or "2" based on an applicant's functionality averaged over one-third of the time in question. The instruction refers to this as the "one-third rule."

¶ 17. For purposes of our analysis, it is instructive to compare the new instruction with the instruction it replaced. Prior to the version of the instruction here at issue, § 1.12D provided as follows:

> We realize that many long term care consumers have conditions and abilities that fluctuate over time, and that it is sometimes difficult to choose the best "multiple choice" answer. In completing the screen, please follow the following guidelines:
>
> . . . .
>
> If the person's functional abilities vary **day to day**, select the answer that most accurately describes their needs on a "bad" day.

WISCONSIN LONG TERM CARE FUNCTIONAL SCREEN INSTRUCTIONS § 1.12D (July 26, 2004).

¶ 18. In contrast, the version of § 1.12D at issue here provides as follows:

> ADLs and IADLs on the [functional screen] are to be checked if the person needs help at least one third of the time. In many cases, a person's need for help is fairly consistent: "She can't do that," or "He always does this," or "Most of the time . . . ." Usually this will reflect the day to day needs of the person.
>
> In other cases, the person's needs arise only some of the time. Very infrequent needs cannot count toward

758

eligibility for long-term care programs. Usually this will reflect variation in abilities over months or years.

When frequency is at question, screeners should use a simple **one-third rule**: If the person has a limitation **one third** of the time (or more often) then it counts as a deficit on the screen. If the person has a limitation less than one third of the time, the ADL/IADL deficit should not be captured. **In general, consider the ADL/IADL function over a six-month timeframe.**

The "one third of the time" criterion does not mean that the screener tests the person or measures their needs or abilities only during the visit to complete the [functional screen]. If a person says "now and then," "every few weeks," or "a few times, not mostly," it's probably less than one third of the time. You can even ask the person, "In the past few months, would you say you've needed help more than one third of the time?"

Remember that "help" includes supervision, verbal cueing, and partial or complete hands-on care.

WISCONSIN LONG TERM CARE FUNCTIONAL SCREEN INSTRUCTIONS § 1.12D (Dec. 21, 2005).

¶ 19. Thus, under the earlier instruction, the level of care for an applicant whose care needs changed daily would have been based on a "bad" day. In contrast, under the new instruction, an applicant must have had at least approximately ten "bad" days per month, depending on the number of days in the month, in order to be considered to have any care need. For example, if, over a six-month timeframe, an applicant needs hands-on assistance with an ADL such as toileting on nine days in a thirty-day month, the screen would state that the applicant "is independent in completing the activity safely" and the screener would enter a "0" next to the ADL on the screen.

759

¶ 20. On appeal, Cholvin contends that the change to § 1.12D must be promulgated as a rule under WIS. STAT. § 227.01(13) because it is a statement of policy of general application which has the effect of law. The State responds that the instruction does not constitute a rule.

## DISCUSSION

■

¶ 21. Under WIS. STAT. § 227.10, any statement of general policy or interpretation of a statute adopted to govern enforcement or administration of that statute must be promulgated as a rule.[7] Pursuant to WIS. STAT. § 227.40(4)(a), a court shall declare a rule invalid if it finds that it was promulgated without complying with statutory rule-making procedures. WISCONSIN STAT. § 227.40(2)(e) allows the validity of a rule to be determined in the context of an appeal of an agency decision to this court.

■

¶ 22. WISCONSIN STAT. § 227.01(13) defines a rule as follows:

"Rule" means a regulation, standard, statement of policy or general order of general application which has the effect of law and which is issued by an agency to implement, interpret or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency . . . .

Thus, for purposes of Chapter 227 and the present case, a rule is "(1) a regulation, standard, statement of policy

---

[7] WISCONSIN STAT. § 227.10 provides: "[e]ach agency shall promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement or administration of that statute."

or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency." *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 814, 280 N.W.2d 702 (1979). The State does not dispute that the instruction at issue meets criteria (1), (4), and (5). We therefore confine our analysis to whether the instruction meets criteria (2) and (3), namely, whether it is of "general application," and whether it has "the effect of law."

*General Application*

¶ 23. In *Citizens for Sensible Zoning*, the Wisconsin Supreme Court explained that "to be of general application, a rule need not apply to all persons within the state." *Id.* at 815–16. "Even though an action applies only to persons within a small class, the action is of general application if that class is described in general terms and new members can be added to the class." *Id.* at 816.

¶ 24. Cholvin argues that § 1.12D is of general application because it applies to the entire class of persons who have their eligibility for a Medicaid waiver program determined by the use of the functional screen. She contends that new members can be added to the class as additional people seek to receive Medicaid waiver benefits and as changes in their fluctuating abilities occur. In response, DHFS contends that § 1.12D does not apply generally because "it only becomes operative in the relatively unusual circumstance where an individual's functional abilities vary significantly over relatively short periods of time and then only as to specific ADLs or IADLs."

¶ 25. We agree with Cholvin. Section 1.12D does not speak to a specific case, nor is it limited to an individual applicant. It announces the general policy and the specific criteria to be employed when entering information on fluctuating levels of functional ability for all applicants. As Cholvin points out, before a screener can determine whether the instruction does or does not affect an individual, the screener must first apply the instruction to each individual applicant. In other words, § 1.12D *applies* to all applicants even though it may *affect* only some of them. We therefore conclude that § 1.12D is a policy of general application.

*Effect of Law*

¶ 26. An agency regulation, standard, statement of policy or general order has been held to have the "effect of law" where criminal or civil sanctions can result as a violation; where licensure can be denied; and where the interest of individuals in a class can be legally affected through enforcement of the agency action. *See generally Wisconsin Elec. Power Co. v. DNR*, 93 Wis. 2d 222, 287 N.W.2d 113 (1980); *Schoolway Transp. Co., Inc. v. Division of Motor Vehicles*, 72 Wis. 2d 223, 240 N.W.2d 403 (1976); and *Frankenthal v. Wisconsin Real Estate Brokers' Bd.*, 3 Wis. 2d 249, 89 N.W.2d 825 (1958).

¶ 27. Cholvin argues that Medicaid applicants and recipients are legally affected by the use of the functional screen, and that the change in the threshold of frequency of care needs has the effect of denying Medicaid benefits to people, such as herself, who have significant care needs less than one-third of the time. She asserts that under the former policy, her care needs would have been captured and considered in the determination of her eligibility, whereas under the revised

policy, the outcome of the functional screen is dictated by the one-third instruction. Thus, she argues, the instruction has the effect of law with respect to her eligibility for the Medicaid waiver.

¶ 28. In contrast, DHFS takes the position that § 1.12D does not have the effect of law because, when taken as a whole, the instructions caution the screener to make objective, individualized determinations as to each question or inquiry on the screen. DHFS refers to the instruction as a "rule of thumb," or guideline, for the exercise of professional judgment and asserts that "there is simply no absolute 'one third of the time' cut-off line." In addition, citing *County of Dane v. Winsand*, 2004 WI App 86, ¶ 11, 271 Wis. 2d 786, 679 N.W.2d 885, DHFS asserts that "[m]aterials developed by an agency as a reference aid for its staff that are 'couched . . . in terms of advice and guidelines rather than setting forth law-like pronouncements' are not a 'rule' within the meaning of WIS. STAT. § 227.01(13) because they are not intended to have the effect of law."

¶ 29. We disagree with DHFS's characterization of the instruction. DHFS has not directed this court to any provision in the instructions that suggests that § 1.12D is simply advisory. To the contrary, the text of § 1.12D indicates that screeners have no discretion as to whether to apply the "one-third" analysis. Section 1.12D provides: "When frequency is at question, *screeners should use* a simple one-third rule . . . ." (Emphasis added.) The word "should" is used to express an obligation or duty. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2104 (1993). "[P]rovisions using express mandatory language are more than informational. In those provisions, the agency speaks with an official voice intended to have the effect of law." *Milwaukee Area Joint Plumbing Apprenticeship Comm. v. DILHR*, 172

Wis. 2d 299, 321 n.12, 493 N.W.2d 744 (Ct. App. 1992). Although mandatory terms can be directory under certain contexts, *see, e.g., Lodl v. Progressive N. Ins. Co.,* 2002 WI 71, ¶ 30, 253 Wis. 2d 323, 646 N.W.2d 314, we do not detect such an intent here. On its face, § 1.12D does not permit variation from the "one-third" requirement, and general admonitions in the instructions that screeners are to make objective, individualized determinations do not overcome the directory nature of § 1.12D. Moreover, the instruction itself describes the "one third of the time" assumption as a "rule."[8] We therefore conclude that the facts in the present case are distinguishable from those in *Winsand* because § 1.12D is not simply advisory, and that § 1.12D has the effect of law.

### Exception for Explanatory or Informational Material

¶ 30. DHFS argues that, even if the instruction meets the requirements necessary to constitute a rule, the instruction nevertheless comes within a statutory exception to the formal rule-making requirement. DHFS points to Wis. Stat. § 227.01(13)(r), which provides that a statement that might otherwise come within the definition of a rule is not subject to formal rule-making requirements if it "[i]s a pamphlet or other explanatory material that is not intended or designed as interpretation of legislation enforced or administered by an agency, but which is merely informational in nature."

¶ 31. DHFS contends that the instruction on "how to score discrete portion of a testing or assessment tool does not rise to the dignity of an 'interpretation of

---

[8] That the rule is written in directive terms is also confirmed by the testimony of the individual who screened Cholvin. The screener testified: "The one third rule means that you can mark it that they need an assist if a third of the time they cannot do something."

legislation.' " Further, it argues that the instruction is merely informational in nature. DHFS also points to the following language in *Tannler v. DHSS*, 211 Wis. 2d 179, 187, 564 N.W.2d 735 (1997):

> The Department may use policies and guidelines to assist in the implementation of administrative rules provided they are consistent with state and federal legislation governing MA. *As long as the document simply recites policies and guidelines, without attempting to establish rules or regulations, use of the document is permissible* . . . . (Emphasis added.)

¶ 32. We are not persuaded that the instruction simply explains an existing policy or guideline. Section 1.12D instead interprets law because it removes from consideration a number of possible functional limitations if they occur less than one-third of the time. The level of functionality in turn triggers an individual's eligibility for participation in COP-W/CIP-II.

¶ 33. Moreover, as discussed above, the "one-third rule" creates a new standard. It directs screeners on how to complete the screen and imposes a one-third of the time threshold before a need can be captured on the screen. This is an entirely new eligibility condition established by DHFS. Because § 1.12D does not simply recite a policy or guideline rather than attempt to establish rules or regulations, the rule in *Tannler* does not support DHFS's position. Accordingly, we conclude that the informational exception in the Wis. Stat. § 227.01(13)(r) does not apply to § 1.12D.

¶ 34. For the above reasons, we conclude that the "one-third rule" set out in § 1.12D should have been promulgated as an administrative rule as required by Wis. Stat. § 227.13 and is therefore invalid. Because this issue is dispositive of the appeal, we do not reach

Cholvin's argument that the record does not establish that the person who completed Cholvin's functional screen was properly certified. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (if a decision on one point disposes of the appeal, we will not decide the other issues raised).

¶ 35. We decline Cholvin's request to order that her eligibility for COP-W/CIP-II Medical Assistance benefits be reinstated. Instead, we remand the matter for a determination of Cholvin's eligibility without application of the "one-third" rule contained in the challenged version of § 1.12D.

*By the Court.*—Order reversed and cause remanded with directions.