# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2022AP718

†Petition for Review filed

Complete Title of Case:

WISCONSIN MANUFACTURERS AND COMMERCE, INC.

AND LEATHER RICH, INC.,

PLAINTIFFS-RESPONDENTS,

V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,

WISCONSIN NATURAL RESOURCES BOARD

AND PRESTON COLE,

DEFENDANTS-APPELLANTS.†

| | |
|---|---|
| Opinion Filed: | March 6, 2024 |
| Submitted on Briefs: | June 13, 2023 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Neubauer, Grogan and Lazar, JJ. |
| Concurred: | |
| Dissented: | Neubauer, J. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the defendants-appellants, the cause was submitted on the briefs of *Gabe Johnson-Karp*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |

Respondent
ATTORNEYS:      On behalf of the plaintiffs-respondents, the cause was submitted on the brief of *Lucas T. Vebber*, *Anthony F. LoCoco*, and *Luke N. Berg* of *Wisconsin Institute for Law & Liberty, Inc.*, Milwaukee; *Scott E. Rosenow* of *WMC Litigation Center*, Madison; and *Delanie M. Breuer* and *Joshua Taggatz* of *Reinhart, Boerner & Van Deuren SC*, Milwaukee.

Non party
ATTORNEYS:      A non-party brief was filed by *Robert D. Lee* and *Jorge Roman-Romero* of *Midwest Environmental Advocates, Inc.*, Madison.

COURT OF APPEALS
DECISION
DATED AND FILED

March 6, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT.** § 808.10 and **RULE** 809.62.

Appeal No. **2022AP718**

Cir. Ct. No. 2021CV342

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

WISCONSIN MANUFACTURERS AND COMMERCE, INC.
AND LEATHER RICH, INC.,

    PLAINTIFFS-RESPONDENTS,

V.

WISCONSIN DEPARTMENT OF NATURAL RESOURCES,
WISCONSIN NATURAL RESOURCES BOARD
AND PRESTON COLE,

    DEFENDANTS-APPELLANTS.

APPEAL from an order of the circuit court for Waukesha County: MICHAEL O. BOHREN, Judge. *Affirmed*.

Before Neubauer, Grogan and Lazar, JJ.

¶1    GROGAN, J.  The Wisconsin Department of Natural Resources, the Wisconsin Natural Resources Board (the "Board"), and Preston Cole (collectively

the "DNR" unless otherwise noted) appeal from the circuit court order granting Wisconsin Manufacturers and Commerce, Inc. ("WMC")[1] and Leather Rich, Inc.'s ("LRI") (collectively "Respondents" unless otherwise noted) summary judgment motion and denying the DNR's motion seeking dismissal of the Board and Respondents' WIS. STAT. § 806.04 (2021-22)[2] claims for lack of jurisdiction and for failure to state a claim pursuant to WIS. STAT. § 802.06(2)(a)3 and 6, respectively. On appeal, the DNR asserts that the circuit court erred in granting Respondents' summary judgment motion and in denying its motion to dismiss because: (1) Respondents' "unpromulgated rule" claims fail to state cognizable claims and were beyond the circuit court's jurisdiction; (2) the Spills Law[3] does not require the DNR to promulgate a list of qualifying emerging contaminants or their respective concentrations[4] before the statutes apply to those substances; (3) the DNR's "interim decision"[5] that it would not issue broad Certificates of Compliance

---

[1] WMC's members include businesses throughout the state, and its "mission is to make Wisconsin the most competitive state in the nation in which to conduct business." It therefore often provides policy input and engages in litigation involving administrative rulemaking proceedings.

[2] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[3] Wisconsin's Spills Law, which is set forth in WIS. STAT. ch. 292 and WIS. ADMIN. CODE §§ NR 700-799, regulates the discharge of hazardous substances and the remediation of environmental pollution caused by the discharge of hazardous substances.

[4] Because the parties primarily refer to "concentrations" throughout their briefing, we will use the same terminology for consistency. However, we note that "concentration" is an imprecise term and that Respondents' argument refers to other types of measurements or quantities such as "thresholds," "levels," etc.

[5] The parties refer to the DNR's statement regarding the Voluntary Party Liability Exemption program as the DNR's "interim decision," and again for consistency, we will use the same terminology.

("COCs") under the Voluntary Party Liability Exemption ("VPLE")[6] program did not require rulemaking and is moot; and (4) the Board should have been dismissed from the suit.[7] For the reasons that follow, we conclude the circuit court did not err in granting Respondents' summary judgment motion and therefore affirm.

## I. BACKGROUND

¶2      LRI is a small, family-owned dry cleaning business located in Waukesha County that has been in operation for approximately forty-three years. In Spring 2018, LRI became aware that its property was potentially contaminated with certain Volatile Organic Compounds ("VOCs") common to dry cleaning facility locations. In compliance with the Spills Law,[8] LRI notified the DNR of the VOCs, and a remediation case was opened. LRI hired an environmental consultant to investigate the property, and the investigation occurred from March to September 2018. Following the investigation, the consultant drafted an investigation report and recommended that LRI remediate the VOCs found in the groundwater on its property. LRI believed "the VOC remediation would be relatively straight forward" and applied to enter the DNR's VPLE program—an environmental cleanup program in which the party entering the program submits an investigation plan and completes

---

[6] *See* WIS. STAT. § 292.15.

[7] Citizens for a Clean Wausau, Clean Water Action Council, River Alliance of Wisconsin, Wisconsin Environmental Health Network, and Doug Oitzinger filed an amicus curiae brief asserting similar arguments—namely, that the DNR is not required to promulgate a rule listing emerging contaminants as hazardous substances before regulating those substances under the Spills Law.

[8] "A person who possesses or controls a hazardous substance or who causes the discharge of a hazardous substance shall notify the department immediately of any discharge not exempted under sub. (9)." WIS. STAT. § 292.11(2)(a).

an investigation report and proposed remediation plan—in January 2019. *See* WIS. STAT. § 292.15.

¶3 The DNR reviews and approves each stage of the VPLE program, and once the DNR approves the final cleanup, the voluntary party receives a COC that provides the participating party with certain liability exemptions. *See* WIS. STAT. § 292.15(2)(a)3. As relevant here, the DNR may issue two types of COCs: (1) broad COCs that provide complete liability exemption; and (2) partial COCs that grant a liability exemption only for certain substances or areas of the property that were satisfactorily remediated. *See* § 292.15(2)(a)3, 292.15(2)(am)1m. It is often advantageous for a property owner to participate in the VPLE program and receive a COC upon remediation completion because this liability protection encourages the sale and redevelopment of the property that had, or was once perceived to have had, contamination.

¶4 The DNR approved and recorded LRI's VPLE program application in February 2019. LRI worked toward full remediation of its location for nearly three years, and during that time it worked closely with an environmental consultant who put together numerous reports detailing the planned scope of work for remediating the VOCs located on site.

¶5 Around the time LRI applied and the DNR accepted LRI into the VPLE program, the DNR issued an "interim decision" via a post on its website that announced that the DNR considered "emerging contaminants" as falling within the definition of hazardous substances under the Spills Law. WISCONSIN STAT. § 292.01(5) defines a "[h]azardous substance" as:

> [A]ny substance or combination of substances including any waste of a solid, semisolid, liquid or gaseous form which may cause or significantly contribute to an increase in

4

> mortality or an increase in serious irreversible or incapacitating reversible illness or which may pose a substantial present or potential hazard to human health or the environment because of its quantity, concentration or physical, chemical or infectious characteristics. This term includes, but is not limited to, substances which are toxic, corrosive, flammable, irritants, strong sensitizers or explosives as determined by the department.

The interim decision identified "concerns over emerging contaminants, particularly per- and polyfluoroalkyl substances ('PFAS') chemicals in Wisconsin and nationally [that] have prompted the DNR to evaluate the potential for historical discharges of PFAS and *other emerging contaminants* at properties enrolled in the VPLE program that are pursuing a COC." (Emphasis added.) The interim decision also explained the circumstances in which the DNR would offer a COC to VPLE participants:

> The interim decision is to offer a voluntary party a COC for the *individual hazardous substances* that are investigated after all the VPLE requirements have been met. DNR *will not* issue a COC that covers all potential hazardous substances, including substances that were not investigated but could be discovered in the future. The agency has the legal authority to offer this interim approach under WIS. STAT. § 292.15(2)(am).

(Emphases added.)

¶6      As part of its announcement regarding this policy change—wherein it would definitively *not* issue the broad COC—the DNR sent letters to VPLE program participants "to remind [them] to assess emerging contaminants and their potential impacts as early in the cleanup process as possible[.]" LRI received its letter in August 2020. Although this change required VPLE participants to test for emerging contaminants, the DNR neither explained nor provided a comprehensive list identifying the substances that constitute an emerging contaminant or a concentration or other numeric standard establishing when an emerging

contaminant falls within the definition of a hazardous substance. The interim decision also clarified that the DNR would no longer issue the COC providing for broad liability protection and that it would issue only the COC granting partial liability protection "for the individual hazardous substances that are investigated after all the VPLE requirements have been met."

¶7 In March 2020, almost two years after LRI's remediation case began, the DNR notified LRI that it had not approved LRI's plan to remediate VOCs because PFAS have been historically linked to dry cleaning operations, which meant that LRI—a dry cleaning business—was a potential source of PFAS (emerging contaminants). LRI then tested its groundwater for two PFAS compounds, and its environmental consultant created an additional report and sent it to the DNR.

¶8 In October 2020, the DNR provided conditional approval for LRI's site investigation with the conditions that it test "several additional soil samples for PFAS" and "'that both individual and combined exceedances' for PFAS be identified." The DNR would not approve LRI's VOC remediation unless and until LRI complied with the additional PFAS requirements. However, the DNR did not provide LRI with any specific PFAS compounds it was required to test, nor did it provide the levels at which the PFAS would be considered hazardous, triggering the Spills Law. After a three-year attempt—including seven environmental reports and a significant monetary investment—LRI notified the DNR of its withdrawal from the VPLE program.

¶9 In February 2021, Respondents filed a Complaint alleging that the DNR's policies regarding emerging contaminants and their corresponding concentrations as hazardous substances, along with the interim decision that limited the scope of COC liability protection it would issue, constituted unlawfully adopted

rules that were invalid and unenforceable because the DNR did not comply with WIS. STAT. ch. 227's rule-promulgation procedures. They also asserted that the DNR must promulgate rules before PFAS and emerging contaminants are covered under the Spills Law. The DNR filed a motion to dismiss Respondents' WIS. STAT. § 806.04 claim that sought a declaration that the DNR was required to promulgate a list of hazardous substances and corresponding concentrations and further sought dismissal of the Board as a party in this matter. The parties thereafter filed cross-motions for summary judgment.

¶10 The circuit court held a hearing on the summary judgment and dismissal motions in December 2021, and in April 2022, it issued an oral ruling granting summary judgment in favor of Respondents and denying the DNR's motion to dismiss. The circuit court explained that pursuant to WIS. STAT. § 227.40(4)(a), the DNR "ha[s] the responsibility to determine what the contamina[nts] are, what the hazardous substances are by statute," which "mean[s] that there has to be a rule-making function by the department in order to do that … so that the individuals have notice as to what the law is and how the law is going to be implemented." Ultimately, the circuit court explained that:

> When the department determines that a substance or a combination of substances or the location of substances causes them to meet the statutory definition of a hazardous substance, it's really engaging [in] a statutory interpretation and it's adopting an interpretation of the statute to govern the statute's enforcement and administration of the statutory definition of hazardous substances. And that's what the department is supposed to do, but there's a way to do it and that requires the[m] to go through a rule-making process so there's proper notice to everyone and there's a procedural fairness to the parties involved, to the property owners, to the responsible parties involved.

Additionally, the circuit court cited *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 280 N.W.2d 702 (1979), and applied the five-factor analysis for

determining whether an agency's policy falls within the statutory definition of a rule.

¶11 In summary, the circuit court concluded that: (1) the DNR's "policy of regulating substances which [it has] referred to as 'emerging contaminants' (including PFAS compounds) as hazardous substances" under the Spills Law "is an unlawfully adopted rule and is invalid and unenforceable;" (2) the DNR's "enforcement of any numeric standard, requirement, or threshold for substances which [it has] referred to as 'emerging contaminants' (including PFAS compounds) as hazardous substances under" the Spills Law "is an unlawfully adopted rule and is invalid and unenforceable;" and (3) the DNR's interim decision related to the VPLE program was "an unlawfully adopted rule" that "is invalid and unenforceable[.]" The DNR now appeals.[9]

## II.  STANDARD OF REVIEW

¶12 This case comes before us on review of a combined grant of summary judgment and denial of a motion to dismiss. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). "Whether an agency's action constitutes a 'rule' under WIS. STAT. § 227.01(13) presents a question of law, which we review de novo." *See Cholvin v. DHFS*, 2008 WI App 127, ¶11, 313 Wis. 2d 749, 758 N.W.2d 118 (quoted source omitted).

---

[9] Shortly after the circuit court entered its order, the DNR filed a motion for a stay pending appeal. After a review of the briefs and relevant arguments, the circuit court granted the stay "until the final resolution of all appeals in this case."

¶13 In reviewing a motion to dismiss, "we accept as true all facts well-pleaded in the complaint and the reasonable inferences therefrom." *Data Key Partners v. Permira Advisers LLC*, 2014 WI 86, ¶¶18-19, 356 Wis. 2d 665, 849 N.W.2d 693. We do not accept "legal conclusions stated in the complaint … as true[.]" *Id.*, ¶19. "Whether a complaint states a claim upon which relief can be granted is a question of law" that we review independently, although "we benefit from" the circuit court's discussion. *Id.*, ¶17. We likewise review challenges to a court's jurisdiction independently. *See Hoops Enters., III, LLC v. Super W., Inc.*, 2013 WI App 7, ¶6, 345 Wis. 2d 733, 827 N.W.2d 120 (Ct. App. 2012).

## III. DISCUSSION

¶14 On appeal, the DNR frames the issues related to Respondents' motion for summary judgment as beginning with the question of whether it was required to engage in rulemaking in the first instance. It then addresses Respondents' arguments that the DNR's policies regarding emerging contaminants, their concentrations, and the issuance of COCs to VPLE participants constituted unlawful rules as a secondary matter. Because Respondents' first three causes of action challenge the DNR's policies as unlawful rules, we conclude it is appropriate to begin our review of the summary judgment decision by addressing that question first. In doing so, for the reasons that follow, we: (1) reject the DNR's jurisdictional challenge based on its characterization of Respondents' claims as primarily challenging the *nonexistence* of rules and conclude instead that because Respondents assert that the DNR's actions constitute rules—albeit unpromulgated ones—WIS. STAT. § 227.40(1) is a proper method for challenging the DNR's actions under these circumstances; and (2) conclude that the DNR's regulation of emerging contaminants as hazardous substances, and at certain concentrations, amounts to unlawfully adopted rules as does its policy regarding issuance of only limited COCs

to VPLE participants. In regard to the DNR's appeal as to the denial of its motion to dismiss, we conclude that the Board is a proper party to this action. *See* WIS. STAT. § 227.01(13), § 227.40(4)(a).[10]

### A. WIS. STAT. ch. 227 Authorizes Respondents' Claims

¶15   On appeal, the DNR argues at the outset that the circuit court lacked jurisdiction in this matter as to *all* of Respondents' claims because, it says, Respondents did not challenge the validity of an *existing* rule but rather the *nonexistence* of a rule—in other words, that Respondents did nothing more than assert that the DNR cannot act in regard to the Spills Law prior to promulgating rules. Specifically, the DNR argues that Respondents:

> purport to seek a declaration that [the] DNR is enforcing "unpromulgated rules" in its administration of the Spills Law, but they do not in fact challenge any "rules"— promulgated or unpromulgated. Instead, they assert that DNR might be misapplying the Spills Law to [LRI's] ongoing investigation of contamination at its property, claiming that DNR lacks authority to "implement or enforce" standards for PFAS at the property.

The DNR refers to this as Respondents' "unpromulgated rule" claim and argues that it is entitled to sovereign immunity because WIS. STAT. § 227.40 does not allow for such claims. The DNR goes on to assert that "in the event [the] DNR actually promulgates a rule about PFAS and the Spills Law, [Respondents] could challenge that rule under WIS. STAT. § 227.40" and that Respondents "tried to short-circuit agency action by conjuring a nonexistent 'rule' based on statements that [the] DNR

---

[10] On appeal, Respondents alternatively argue that the "DNR lacks explicit authority to regulate emerging contaminants as hazardous substances without rulemaking." Because we conclude that the DNR's policies amounted to rules that are unenforceable because they were not properly promulgated, it is unnecessary to address Respondents' alternate argument.

made in a website post and letters … asking this Court to declare *those statements* invalid[.]"

¶16    While the DNR's jurisdictional argument is creative, if nothing else, it misses the mark.  In essence, the DNR seems to imply that WIS. STAT. § 227.40 authorizes a rule challenge only where something specifically entitled "rule" exists or where an agency, at the very least, attempted to promulgate a rule:  "[I]n the event [the] DNR *actually promulgates* a rule about PFAS and the Spills Law, [Respondents] could challenge *that* rule under WIS. STAT. § 227.40."  (Emphases added.)  This cannot be for at least three reasons.

¶17    First, if WIS. STAT. § 227.40 only authorized such challenges, an agency such as the DNR could evade review of its policies by simply refusing to refer to anything as a rule or by simply enacting a policy without following the rule-promulgation procedures.  Such a construction would be unreasonable, and we do not construe statutes in an unreasonable manner.  *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶¶45-46, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results.").

¶18    Second, *Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814, establishes a five-part framework for analyzing whether an agency's policy falls within WIS. STAT. § 227.01(13)'s definition of a "rule."  This alone suggests that a policy—such as those at issue here—may fall within the definition of a rule regardless of how an agency refers to the policy and regardless of whether an agency attempted to comply with the rulemaking procedures.  If that were not the case, we would have little need for the *Citizens for Sensible Zoning, Inc.* framework.

¶19 Third, WIS. STAT. § 227.40(4)(a) specifically states that "[i]n any proceeding pursuant to this section for judicial review of a rule or guidance document, the court shall declare the rule or guidance document invalid if it finds that it … *was promulgated or adopted without compliance with statutory rule-making or adoption procedures.*" (Emphasis added.) An unpromulgated rule necessarily falls under the umbrella of a rule that was "promulgated … without compliance with statutory rule-making or adoption procedures." *See id.*[11]

¶20 To that end, we reject the DNR's argument that the circuit court lacked jurisdiction as to what it refers to as Respondents' "unpromulgated rule" claims. To the contrary, it is clear that Respondents' Complaint specifically alleges that the DNR's actions regarding regulations of emerging contaminants, both as to which substances qualify as hazardous substances and at what concentrations, as well as the DNRs actions concerning the type of COC it would issue to VPLE program participants, are "unlawfully adopted rule[s], and [are therefore] invalid and unenforceable" because they do not comply with WIS. STAT. ch. 227's procedural rulemaking requirements. The question at hand, therefore, is whether the DNR's challenged policies qualify as rules within the definition set forth in WIS. STAT. § 227.01(13), and, if so, whether they are valid and enforceable.

---

[11] We also note our supreme court recently applied the *Citizens for Sensible Zoning, Inc. v. DNR*, 90 Wis. 2d 804, 280 N.W.2d 702 (1979), framework in a case where there was a challenge to an order issued by the Department of Health Services without first engaging in rulemaking. *See Wisconsin Legislature v. Palm*, 2020 WI 42, ¶¶2-3, 391 Wis. 2d 497, 942 N.W.2d 900. Although *Palm* involved the legislature challenging the Secretary of the Department of Health Services' unpromulgated emergency order, it provides general support for our conclusion here that Respondents are authorized to assert the DNR's requirements are unpromulgated rules.

¶21 To answer this question, we begin with WIS. STAT. § 227.40(1),[12] which provides that "[e]xcept as provided in sub. (2), the exclusive means of judicial review of the *validity of a rule* or guidance document shall be an action for declaratory judgment as to the validity of the rule or guidance document[.]" (Emphasis added.) In a proceeding seeking a declaratory judgment regarding the validity of a rule, "the court shall declare the rule or guidance document invalid if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency *or was promulgated or adopted without compliance with statutory rule-making or adoption procedures*." Sec. 227.40(4)(a) (emphasis added). Having reviewed the Record and Complaint, we conclude that WIS. STAT. ch. 227 explicitly authorizes Respondents' claims because Respondents assert that the DNR's policies amount to rules that are invalid because the DNR did not enact them through the proper rulemaking procedures. Because such claims challenge "the validity of a rule," *see* § 227.40(1), we reject the DNR's suggestion that it is entitled to sovereign immunity as to these claims.

¶22 Having determined that the circuit court did not lack jurisdiction to address these claims, we turn now to the question of whether the DNR's policies related to the regulation of emerging contaminants as hazardous substances and the concentrations of those contaminants, along with the circumstances under which it would issue certain types of COCs to VPLE participants, fall within the statutory definition of a rule.

---

[12] Because we conclude that WIS. STAT. § 227.40 provides authority for Respondents' claims, it is unnecessary to address whether this lawsuit is alternatively appropriate under WIS. STAT. § 227.52. Likewise, because we ultimately conclude that the DNR's challenged policies constitute rules and that those rules are invalid and unenforceable, it is also unnecessary to address Respondents' WIS. STAT. § 806.04 claim and the DNR's corresponding jurisdictional challenge. *See **Martinez v. Rullman***, 2023 WI App 30, ¶5, 408 Wis. 2d 503, 992 N.W.2d 853 (cases should be decided on the narrowest possible ground).

## B. *The DNR's Challenged Actions Fall Within the Definition of a "Rule"*

¶23    It is "[a] fundamental principle in our legal system … that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Lamar Cent. Outdoor, LLC v. DHA*, 2019 WI 109, ¶39, 389 Wis. 2d 486, 936 N.W.2d 573 (quoted source omitted). "Procedural safeguards, generally, are those requirements imposed by the Administrative Procedures Act, codified at ch. 227." *Wisconsin Legislature v. Palm*, 2020 WI 42, ¶34, 391 Wis. 2d 497, 942 N.W.2d 900. To that end, WIS. STAT. § 227.01(13) defines a rule as "a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." Rulemaking as outlined in WIS. STAT. ch. 227 helps eliminate "arbitrary or oppressive conduct by an agency." *See Palm*, 391 Wis. 2d 497, ¶35.

¶24    Our supreme court breaks WIS. STAT. § 227.01(13)'s definition of "rule" into five parts and has explained that for purposes of WIS. STAT. ch. 227, an agency's action is a rule (even if the agency does not refer to it as such) if the action is: "(1) a regulation, standard, statement of policy or general order; (2) of general application; (3) having the effect of law; (4) issued by an agency; (5) to implement, interpret or make specific legislation enforced or administered by such agency as to govern the interpretation of procedure of such agency." *See Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814. If an agency's policy meets the five-part definition of a rule, the policy is invalid and unenforceable when it has not been promulgated according to statutory rulemaking procedures. *See Cholvin*, 313 Wis. 2d 749, ¶1; *see also* WIS. STAT. § 227.40(4)(a) (a rule is invalid if it "was promulgated or adopted without compliance with statutory rule-making or adoption procedures").

¶25    Respondents challenged three specific DNR policies as amounting to rules that the DNR failed to promulgate in accordance with statutory requirements. Specifically, the three challenged policies are as follows: (1) the DNR's regulation of "emerging contaminants, including PFAS compounds, as Hazardous Substances"; (2) the DNR's regulation/enforcement of "any standard, requirement, or threshold related to emerging contaminants, including PFAS, in the [remediation and redevelopment] and VPLE programs"; and (3) the DNR's "new 'interim decision' policy" indicating it would not issue COCs that "offer[ed] broad environmental liability protection for undiscovered, and previously unknown, Hazardous Substances" to VPLE program participants. Accordingly, we must apply the five-part framework to each of the challenged policies to determine whether they constitute rules.

1.    Emerging Contaminants as Hazardous Substances

¶26    Wisconsin's Spills Law defines "hazardous substance" broadly:

> "Hazardous substance" means any substance or combination of substances including any waste of a solid, semisolid, liquid or gaseous form which may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness or which may pose a substantial present or potential hazard to human health or the environment because of its quantity, concentration or physical, chemical or infectious characteristics. This term includes, but is not limited to, substances which are toxic, corrosive, flammable, irritants, strong sensitizers or explosives as determined by the department.

WISCONSIN STAT. § 292.01(5). The DNR recently determined that a category of substances referred to as "emerging contaminants"—which includes PFAS—falls within this broad definition. However, no statute or rule identified which substances qualify as emerging contaminants, and the DNR itself acknowledges that the

15

universe of emerging contaminants is large—noting in its appellate brief that "[t]here are an estimated 9,000 individual PFAS compounds and thousands of PFAS mixtures"—and that what is considered an emerging contaminant is fluid and can change over time.

¶27 In light of the DNR's determination that emerging contaminants fall within the Spills Law's definition of hazardous substances, Respondents alleged that this new policy constituted a rule. We agree. Specifically, the DNR announced on its website that "[w]hen discharged to the environment, PFAS compounds meet the definitions of a hazardous substance and/or environmental pollution under state statutes (s. 292.01, Wis. Stats.)." The announcement further stated that:

> In Wisconsin, persons who own properties that are the source of PFAS contamination, or who are responsible for discharges of PFAS to the environment, are responsible for taking appropriate actions. Those individuals must also immediately notify the state, conduct a site investigation, determine the appropriate clean-up standards for the PFAS compounds in each media impacted (e.g., soil, groundwater, surface water and sediment) and conduct the necessary response actions.

Additionally, in August 2020, the DNR sent a letter to all VPLE program participants with open remediation sites and "remind[ed] [them] to assess emerging contaminants and their potential impacts as early in the cleanup process as possible[.]" That letter further informed the participating parties that it is their responsibility "to evaluate hazardous substance discharges and environmental pollution including emerging contaminants under the Wis. Admin. Code NR 700 rule series[ and that] [e]merging contaminants discharged to the environment, including certain PFAS, meet the definition of hazardous substance and/or environmental pollution under WIS. STAT. § 292.01[.]"

¶28 Although the DNR asserts that these policy statements do not fall within the five-part definition of a rule as set forth in *Citizens for Sensible Zoning, Inc.* and WIS. STAT. § 227.01(13), the DNR is incorrect. [13]

¶29 In applying the *Citizens for Sensible Zoning, Inc.* test, we first consider whether the challenged policy is "a regulation, standard, statement of policy or general order[.]" *Id.*, 90 Wis. 2d at 814. Here, the DNR's statements regarding emerging contaminants in regard to the Spills Law inform participating parties that they must evaluate emerging contaminants and that those emerging contaminants are subject to regulation as hazardous substances under Wisconsin law. The statements further inform the parties that if they discharge such substances, they will be subject to the Spills Law's regulatory requirements. As such, these policy statements satisfy the first element of a rule.

¶30 Second, the policy or action in question must be "of general application," meaning that the "class is described in general terms and new members can be added to the class." *Id.* at 814-16. Additionally, a policy can "*appl[y]* to all applicants even though it may *affect* only some of them." *See Cholvin*, 313 Wis. 2d 749, ¶25; *see also Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 816 ("Thus we held that an instruction by an administrative agency applying only to partners in licensed real estate partnerships is of general application within the meaning of [WIS. STAT.] ch. 227."). Here, the DNR's policy of regulating emerging

---

[13] The DNR also argues that "[t]he Spills Law does not require [it] to promulgate a list of qualifying substances or concentrations before the statutes apply to those substances." While it is ultimately unnecessary to address this aspect of the DNR's argument in light of our conclusion that the DNR's actions in this case fall within the definition of a "rule," we nevertheless note that the DNR's argument that it "has never promulgated rules establishing a list of qualifying 'hazardous substances' or concentrations" is a nonstarter. Regardless of whether or not the DNR has done so in the past, it does not mean that its actions are not subject to challenge or that its past actions were in compliance with the relevant legal requirements.

contaminants is a policy of general application because the DNR announced the policy both to the public via its website and in the August 2020 letter sent to "all Responsible Parties (RPs) that currently have an open contamination site[.]" The policy therefore applies not only to current VPLE program participants but also to any potential future participants and parties that have discharged emerging contaminants into the environment. To that end, any party that discovers a discharge of emerging contaminants on its property can be added to the class. Accordingly, the emerging contaminant policy statements satisfy the second element of a rule.

¶31 Third, the policy statement must "hav[e] the effect of law[.]" *Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814. An agency's policy has the "'effect of law' where criminal or civil sanctions can result as a violation; where licensure can be denied; and where the interest of individuals in a class can be legally affected through enforcement of the agency action." *Cholvin*, 313 Wis. 2d 749, ¶26. The DNR alleges that the policy statement posted on its website "simply 'communicate[d] intended applications of the law[.]'" (First alteration in original; citation omitted.) Not so. The policy statement at issue does not simply communicate intended applications of the law; rather, the statement has the effect of law because it carries potential civil penalties. Specifically, the Spills Law requires parties to report the discharge of hazardous substances and to take actions to restore the environment, *see* WIS. STAT. § 292.11(2)-(3), and the DNR's website makes clear that "WIS. STAT. § 292.99 … [a]uthorizes penalties up to $5,000 for each violation of the notification requirement."

¶32 Moreover, statements "'using express mandatory language are more than informational. In those provisions, the agency speaks with an official voice intended to have the effect of law.'" *Cholvin*, 313 Wis. 2d 749, ¶29 (citation omitted). The DNR used such mandatory language in its policy statement on its

18

website: "[P]ersons who own properties that are the source of PFAS contamination, or who are responsible for discharges of PFAS to the environment, are responsible for taking appropriate actions" and "*must also* immediately notify the state, conduct a site investigation, determine the appropriate clean-up standards for the PFAS … and conduct the necessary response actions." (Emphasis added.) In stating that failure to comply will subject offending parties to civil penalties, it is clear that the DNR intended this mandatory language to have the effect of law. As such, this satisfies the third element of a rule.

¶33 The fourth and fifth elements of a rule include that it be "issued by an agency" "to implement, interpret or make specific legislation enforced or administered by such agency[.]" ***Citizens for Sensible Zoning, Inc.***, 90 Wis. 2d at 814. Whether the DNR is an agency is not in dispute, *see* WIS. STAT. § 227.01(1) (defining agency as "a board, commission, committee, department or officer in the state government"), and it is also undisputed that the DNR is the agency that issued the policy statements. Finally, the DNR's policy statement—that participating parties must report and remediate emerging contaminants as hazardous substances under the Spills Law—interprets the statute, implements the Spills Law, and regulates how the law will be administered and enforced moving forward. Thus, the fourth and fifth elements of a rule are satisfied.

¶34 Because the DNR's policy statement—which it posted on its website and sent to participating parties involved in the VPLE program via letter—regarding the regulation of emerging contaminants as hazardous substances under the Spills Law meets all five parts of the definition, it constitutes a rule pursuant to WIS. STAT. § 227.01(13). Because this policy constitutes a rule, it is invalid and unenforceable under these circumstances because the DNR failed to promulgate this rule pursuant to WIS. STAT. ch. 227's procedural requirements. Accordingly, the circuit court did

not err in concluding that the DNR's policy statement regarding emerging contaminants is invalid and unenforceable.

### 2. Emerging Contaminants at Certain Concentrations

¶35 Respondents also alleged that the DNR has enforced "certain standards, requirements, and thresholds for PFAS and related substances"—e.g., concentrations of those substances—and that such enforcement "is a rule" within the meaning of WIS. STAT. § 227.01(13). At the time pertinent to this case, it does not appear that the DNR had announced specific concentrations of emerging contaminants that render those substances "hazardous"—Respondents allege as much in their Complaint, stating that the DNR "use[s] a method not known to the public to determine which substances, or which combinations or concentrations of those substances, qualify as a Hazardous Substance[.]" Despite the apparent lack of specifically identified concentrations, however, it is nevertheless clear that the DNR has identified certain substances as potentially falling under the umbrella of hazardous substances, and it necessarily follows that those substances, such as the emerging contaminants at issue, have a concentration at which they fall within the "hazardous substance" definition. Indeed, the definition of "hazardous substance" itself refers to concentrations: "'Hazardous substance' means any substance or combination of substances … which may pose a substantial present or potential hazard to human health or the environment *because of its … concentration*[.]" WIS. STAT. § 292.01(5) (emphasis added).

¶36 Here, the DNR sent LRI a letter in October 2020 stating that "[i]n future reports, both the individual and combined *exceedances* need to be identified for PFAS." (Emphasis added.) In order for there to be an "exceedance," there must be a specific concentration at which an emerging contaminant, such as PFAS,

"exceeds" that level. This requirement—that parties report "exceedances"—therefore indicates that the DNR, whether publicly or not, has determined a level at which the concentration of a given emerging contaminant falls within the definition of a "hazardous substance." It is that policy we review here.

¶37 In applying the first element of the *Citizens for Sensible Zoning, Inc.* test, we again look to whether the challenged policy is "a regulation, standard, statement of policy or general order[.]" *Id.*, 90 Wis. 2d at 814. In the above-referenced October 2020 letter sent to LRI (and other VPLE program participants), the DNR stated that "[i]n future reports, both the individual and combined *exceedances* need to be identified for PFAS[,]" and the DNR required all parties "who own properties that are the source of PFAS contamination, or who are responsible for discharges of PFAS to the environment" to "immediately notify the state" of the discharge. (Emphasis added.) The DNR's policy requiring reporting of an "exceedance" is undoubtedly "a regulation, standard, statement of policy or general order[.]" *See id.*

¶38 This policy also meets the second and third elements of the *Citizens for Sensible Zoning, Inc.* test for the same reasons discussed above in regard to the DNR's policy regarding emerging contaminants as hazardous substances. Specifically as to the second element, the policy is of general application because it applies to any party that discovers a discharge of emerging contaminants on its property, and parties can be added to the class upon discovery of hazardous discharges on their properties. The specific-concentration policy also satisfies the third element of a rule because it has the effect of law in that exceedances of hazardous substances must be reported, and failure to report such exceedances could subject a party to civil penalties up to $5,000 for each violation of the notification

requirement pursuant to WIS. STAT. §§ 292.11(2)(a) and 292.99(1). *See Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814.

¶39     The DNR's specific-concentration policy also meets the fourth and fifth elements of a rule. *See id.* As previously established, the DNR is an agency, and the DNR is the agency that issued the policy. Finally, it is clear that the DNR's policy stems from its interpretation of WIS. STAT. § 292.01(5). As noted above, § 292.01(5) states that a "[h]azardous substance" is a "substance or combination of substances" that may pose certain health and environmental concerns "because of its quantity, *concentration* or physical, chemical or infections characteristics." (Emphasis added.) Thus, in determining at what point a party must report an "exceedance"—which can only occur if there is a lower limit to the concentration amount (even if that amount is simply zero) to begin with—required the DNR to interpret this statute. In other words, in order to determine the specific concentrations that result in an exceedance, the DNR necessarily interpreted § 292.01(5) as establishing that the presence of particular substances at particular concentrations meets the definition of hazardous substances and thus requires reporting and remediation.[14] *See Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814. Accordingly, the circuit court did not err when it determined that the DNR's policy regarding emerging contaminants at specific concentrations is a rule that is invalid and unenforceable.

### 3.     COCs Under the VPLE Program

---

[14] We further note that WIS. STAT. § 227.10(2m) makes clear that "[n]o agency may implement or enforce any standard, requirement, or threshold … unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated[.]"

¶40 In addition to the policies set forth above, the DNR also issued a policy—which the parties refer to as the "interim decision"—regarding the DNR's issuance (or non-issuance) of certain types of COCs to VPLE program participants. The interim decision limited the scope of COCs that the DNR would issue. Specifically, on its website, the DNR announced that it would offer VPLE program participants "a COC for the individual hazardous substances that are investigated after all the VPLE requirements have been met" but that it would *not* issue the broader COC covering "all potential hazardous substances, including substances that were not investigated but could be discovered in the future." The DNR asserts that this interim decision regarding the issuance of COCs is merely guidance and not a rule because it was exercising its statutory discretion to inform participating parties that it would issue partial liability COCs instead of general liability COCs. *See* WIS. STAT. § 292.15. However, applying the *Citizens for Sensible Zoning, Inc.* framework, the DNR's interim decision, like the previously discussed emerging contaminant policies, is a rule.

¶41 First, the interim decision is a "regulation, standard, statement of policy or general order" because it informs all VPLE program participants that the DNR will not issue a broad COC for general liability protection for substances the party did not investigate during the VPLE program process. *See id.*, 90 Wis. 2d at 814. Thus, the interim decision meets the first element of a rule.

¶42 The interim decision also meets the second *Citizens for Sensible Zoning, Inc.* element—general application—because it applies not only to current VPLE program participants but also to future VPLE program participants. *See id.*, 90 Wis. 2d at 814. Next, the interim decision, which dictates the type of future liability protection a party may receive vis-à-vis the type of COC that the DNR issues, has the effect of law because it legally affects "the interest of individuals" in

the VPLE program in regard to liability protection for future remediation. *See Cholvin*, 313 Wis. 2d 749, ¶26; *see also Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814. Fourth, the DNR—as previously established—is an agency, and it issued the interim decision. *See Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814. Finally, as stated on the DNR's website, the DNR adopted the interim decision to implement and regulate the VPLE program's liability exemptions pursuant to WIS. STAT. § 292.15(2)(am). *See Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 814.

¶43　Accordingly, we conclude that the DNR's interim decision satisfies the five-part definition of a rule under *Citizens for Sensible Zoning, Inc.*, 90 Wis. 2d at 813-14 and WIS. STAT. § 227.01(13). Because the DNR did not promulgate this rule in accordance with the required rulemaking procedures, the circuit court did not err in concluding that the interim decision is invalid and therefore unenforceable.

¶44　Despite having determined that the circuit court correctly concluded that the interim decision meets the requirements of a rule, we also briefly address the DNR's argument that even if the interim decision is a rule (it is), we should nevertheless reverse the circuit court on this issue on the basis that it is moot (it is not). "An issue is moot when its resolution will have no practical effect on the underlying controversy." *PRN Assocs. LLC v. DOA*, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559. "[T]he party who alleges that a controversy before us has become moot has the 'heavy burden' of establishing that we lack jurisdiction." *Michigan v. Long*, 463 U.S. 1032, 1042 n.8 (1983).

¶45　In support of its mootness argument, the DNR contends that it has since invalidated the interim decision and that the interim decision is therefore "no

longer the operative guidance regarding COCs for properties with potential PFAS contamination." However, despite this assertion, it is not definitively clear from the Record that the interim decision is no longer in effect.[15] We therefore decline to apply the mootness doctrine under these circumstances.

¶46 In summary, the three policies addressed above—emerging contaminants as hazardous substances, emerging contaminants at certain concentrations, and COC approval under the VPLE program—fall within the definition of a rule as set forth in *Citizens for Sensible Zoning, Inc*. Because the DNR did not promulgate these rules in accordance with WIS. STAT. ch. 227's procedural requirements, they are invalid and unenforceable.[16] *See* WIS. STAT. § 227.40(4)(a) ("the court shall declare the rule or guidance document invalid if it finds that it … was promulgated or adopted without compliance with statutory rule-making or adoption procedures").

### C. The Board is a Proper Party

¶47 As its final argument, the DNR asserts that Respondents failed to present any evidence that the Board had a role in the DNR's policy changes relating to emerging contaminants, concentration thresholds, and issuance of COCs and that the circuit court therefore erred in denying the request to dismiss the Board as a party in this matter. Specifically, the DNR asserts that the Spills Law's references

---

[15] In its appellate briefing, the DNR states that "*it plans* to issue a general COC for a site now in the VPLE program *upon completion* of remaining remediation requirements" and points to the affidavit of Darsi Foss, the Administrator of the Environmental Management Division at the DNR. (Emphases added.) This single statement is insufficient for this court to accept the DNR's argument that this issue is moot.

[16] Because the DNR's policies fall within the definition of a rule, it was required to engage in the formal rulemaking process. It would make little sense to conclude something was a rule but that rulemaking nevertheless was not actually required. Having reached this conclusion, as previously noted, it is unnecessary to further address the related issues the DNR raises on appeal.

to the "Department" clearly refer only to "the department of natural resources" and *not* to the Board.

¶48 In denying the request to dismiss the Board from this matter, the circuit court reasoned that if the DNR's position were correct, it would "in essence mean[] … that the department of Natural Resources somewhat operates as an automaton. It's an all-knowing, all-functioning, all-proceeding body without any way to control it." We conclude the circuit court did not err in denying the DNR's request to dismiss the Board. As previously set forth above, the DNR enacted policies that are invalid and unenforceable rules. The DNR operates under the supervision of the Board, *see* WIS. STAT. § 15.34(1), and because declaratory judgment actions may "be brought against the officer or agency charged with administering the statute," the Board is a proper party to the suit. *See Lister v. Board of Regents*, 72 Wis. 2d 282, 303, 240 N.W.2d 610 (1976); *see also* § 15.34(1) ("There is created a department of natural resources *under the direction and supervision of the natural resources board*." (emphasis added)). Accordingly, the circuit court did not err because the Board is a proper party.

## IV. CONCLUSION

¶49 For the reasons set forth above, we conclude that the DNR's policy changes related to its regulation of emerging contaminants as hazardous substances under the Spills Law, the concentration of those contaminants, and its "interim decision" policy regarding issuance of COCs for VPLE program participants are rules within the meaning of WIS. STAT. § 227.01(13). Because these policy changes constitute rules that were not enacted in compliance with WIS. STAT. ch. 227's requirements, the rules are invalid and therefore unenforceable. Additionally, the

circuit court did not err in concluding that the Board is a proper party in this matter. We therefore affirm the circuit court's order.

*By the Court.*—Order affirmed.

No.   2022AP718(D)

¶50   NEUBAUER, J. (*dissenting*). Wisconsin's Spills Law imposes certain obligations on parties who are responsible for discharges of substances that are hazardous to human health or the environment. Since the law's enactment in 1978, the Wisconsin Department of Natural Resources (DNR) has overseen more than 40,000 hazardous substance cleanups. Today, for the first time since the statute was enacted, the court holds that the DNR must promulgate rules identifying certain substances as hazardous before the Spills Law applies to discharges of those substances. I disagree with the majority's decision to invalidate each of what the majority contends are DNR "policies." In my view, none of the statements about the law that Wisconsin Manufacturers and Commerce Inc. and Leather Rich, Inc. (LRI) (together, Respondents) challenge satisfies the five-part test for a "rule" as defined in WIS. STAT. § 227.01(13). Additionally, I disagree with Respondents' argument that WIS. STAT. § 227.10(2m) requires the DNR to promulgate a rule identifying PFAS and other emerging contaminants as hazardous before the Spills Law applies.[1] Thus, I would reverse the circuit court's order and remand this case for entry of judgment in favor of the DNR.

I.

---

[1] In light of these conclusions, I need not address the DNR's argument that the Natural Resources Board should have been dismissed from this case because it had no role in issuing the pronouncements challenged by Respondents.

¶51 An overview of the Spills Law and the role the legislature has directed the DNR to play in its operation will provide useful context for the discussion of the claims in this case. The Spills Law is triggered by the discharge of a "[h]azardous substance," a term which the law defines to be

> any substance or combination of substances including any waste of a solid, semisolid, liquid or gaseous form which may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness or which may pose a substantial present or potential hazard to human health or the environment because of its quantity, concentration or physical, chemical or infectious characteristics.

WIS. STAT. § 292.01(5). The definition also "includes, but is not limited to, substances which are toxic, corrosive, flammable, irritants, strong sensitizers or explosives as determined by the department."[2] *Id.*

¶52 Three aspects of this definition are noteworthy here. First, it is undeniably broad, in part because it is phrased in terms of possibilities, not certainties. A substance is hazardous under the Spills Law if it "*may* cause or significantly contribute to an increase" in mortality or severe illness or if it "*may* pose a substantial present or *potential* hazard to human health or the environment." *See* WIS. STAT. § 292.01(5) (emphases added).

¶53 Second, the definition is inherently (and unambiguously) fact-specific. In lieu of merely listing every conceivable substance and any combination and any form of substances that qualify as hazardous, WIS. STAT. § 292.01(5) requires evaluation of a substance's actual or potential risk to human health or the environment based on its quantity, concentration, physical, chemical, or infectious

---

[2] I also refer to the DNR as "the department" in this opinion to avoid overly repetitious use of the acronym.

characteristics, the circumstances surrounding a particular discharge, and the location at which the discharge occurs.

¶54    Third, the definition contemplates—but does not require—DNR involvement in identifying a substance as a "hazardous substance" before a discharge occurs.  No language in WIS. STAT. § 292.01(5) or any other provision in the Spills Law requires the DNR to identify, by rule or otherwise, those substances that meet the statutory definition of a "[h]azardous substance."[3]  This is not surprising, given the case-by-case analysis the definition requires, including consideration of the quantity, concentration, characteristics, and potential hazards or effects of the substance(s) involved and the circumstances and location of the discharge.  The statute does, however, recognize that the DNR has authority to designate substances as falling within the statutory definition by determining them to be "toxic, corrosive, flammable, irritants, strong sensitizers or explosives."  *See id.*

¶55    The absence of any statutory command to identify substances that meet WIS. STAT. § 292.01(5)'s definition of "[h]azardous substance" (much less a command to do so through rulemaking) stands in stark contrast to numerous instances elsewhere in the Spills Law where the legislature specifically directed the DNR to address an issue or complete a task through rulemaking.  Notably, WIS. STAT. § 292.31(2) states that the DNR "shall promulgate rules relating to investigation and remedial action for sites or facilities and other properties at which the air, land, or waters of the state have been affected by the discharge of a hazardous

---

[3]  In its oral ruling, the circuit court espoused a different view of the statute, stating that the DNR has a "responsibility to determine what the contamina[nts] are, what the hazardous substances are by statute, and I think they have a responsibility to do that prior to the responsible parties getting involved in the process."  Neither the circuit court nor the majority identify any provision in the Spills Law that purports to impose this responsibility.

substance or other environmental pollution." This includes rules addressing the methods for investigating contamination, taking remedial action, and ensuring that the cost of cleanup efforts is "appropriate in relation to the associated benefits." Sec. 292.31(2)(a), (b), (d). In addition, the Spills Law requires the DNR to "establish by rule criteria and procedures for the development, establishment and amendment of a contingency plan for the undertaking of emergency actions in response to the discharge of hazardous substances." WIS. STAT. § 292.11(5)(a); *see also* WIS. STAT. § 292.41(3) (imposing same obligation on the DNR to promulgate rules for contingency plans related to abandoned containers).

¶56 The legislature spoke with similar clarity in the Spills Law in identifying issues on which the DNR can, but is not required to, act by rulemaking. WISCONSIN STAT. § 292.21(1)(a)1., for example, states that persons engaging in "lending activities" do not possess, control, or cause hazardous substances discharges. Subparagraph (1)(a)3. states that the DNR "may, by rule, designate as lending activities other activities" in addition to those identified as such in the statute's definition of "lending activities." Section 292.21(1)(e) similarly states that the DNR "may promulgate rules further specifying the activities to be carried out by a lender" for certain environmental assessments. Finally, the legislature specified that the DNR "may" promulgate rules for the assessment and collection of fees for certain oversight or other activities it performs under the Spills Law. *See, e.g.*, WIS. STAT. §§ 292.11(7)(d)2., 292.13(3), 292.15(5), 292.35(13).

¶57 Though not dispositive, the absence of any statutory language in the Spills Law directing the DNR to establish by rule the universe of substances that constitute hazardous substances, when considered together with the numerous other instances in the statute where the legislature has explicitly directed or allowed the DNR to promulgate rules, undermines Respondents' views of the how the Spills

4

Law operates and the DNR's role with respect to hazardous substance determinations.

¶58 Upon learning of a hazardous substance discharge, persons who possess or control the substance or who cause the discharge are required to report the discharge immediately to the DNR. *See* WIS. STAT. § 292.11(2). After a discharge is reported, these responsible parties must then "take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to [Wisconsin's] air, lands or waters." *See* Sec. 292.11(3). As explained by the DNR, "fairly straightforward and minimal cleanup efforts will satisfy a responsible party's cleanup obligations" in many cases. Sometimes, however, a more extensive site investigation may be required given the scope and complexity of the discharge, the substances involved, and the history and characteristics of the property where the discharge occurs. A responsible party must hire a qualified consultant to investigate the discharge in order to identify the substances involved, assess the impacts of the discharge, and propose actions to restore the environment. For present purposes, the important point is that no action by the DNR is required to trigger these reporting, investigation, and remediation obligations. Instead, the Spills Law is structured such that responsible parties are initially obliged to assess whether a discharge of a hazardous substance has occurred, an assessment that is inherently case specific.

¶59 As described in an affidavit from Tim Alessi, the DNR official who monitored LRI's remediation efforts, the DNR's role after it has been notified of a discharge and presented with a remediation plan is to "provide comments so responsible parties may implement actions earlier in the process rather than wait until they apply for case closure and learn that more work is necessary." As set forth in various rules, the DNR may, but is not required to, approve a responsible

5

party's proposed plan to investigate or remediate its site before the party proceeds with those actions. *See* WIS. ADMIN. CODE § NR 716.09(3) (Apr. 2023); WIS. ADMIN. CODE § NR 722.15 (Nov. 2023). Instead, as Christine Haag, the current director of the DNR's Remediation and Redevelopment program, stated in an affidavit submitted to the circuit court, "DNR's role is primarily to evaluate response actions and confirm that entities have taken the appropriate actions to remediate environmental contamination." Indeed, though the DNR has promulgated rules that govern the investigation and remediation process, the rules are expressly intended to "allow for site-specific flexibility, pertaining to the identification, investigation and remediation of sites and facilities which are subject to regulation under" the Spills Law and to allow "responsible parties and other interested persons … to efficiently move through the process set forth in [the regulations] *with minimal department oversight*, except where the department has specified that more in-depth oversight is needed." WIS. ADMIN. CODE § NR 700.01(2) (June 2021) (emphasis added). With this background in mind, I turn to Respondents' claims.

## II.

### A. PFAS as Hazardous Substances

¶60     Respondents contend that the DNR is enforcing, as an unpromulgated rule, a policy of treating emerging contaminants, including per- and polyfluoroalkyl substances, or PFAS, as hazardous substances under the Spills Law. As Haag

explained in her affidavit, the term "emerging contaminants" is "commonly used in the field of environmental regulation" to describe substances that have not been the subject of extensive "toxicological or human health-related research … but for which there is increasing evidence of adverse human and environmental health effects." Examples of substances that were once considered emerging contaminants but that are now "well-accepted as hazardous substances" because of advances in scientific knowledge about these substances and testing capabilities include polychlorinated biphenyls (PCBs) and other substances formerly used in the dry-cleaning and petroleum industries. Responsible parties have reported and remediated discharges of these substances for years under the Spills Law without the DNR having promulgated rules designating them as hazardous substances under WIS. STAT. § 292.01(5).

¶61 PFAS are a group of compounds that, according to Haag, "are used in hundreds of industrial and commercial applications" and have become the subject of scientific research in recent decades as improvements in testing methodologies have allowed them to be detected at increasingly lower levels. Like other hazardous substances, PFAS "do not break down in the environment and remain for long periods cycling in air, water, and soil." As scientific knowledge regarding PFAS has grown, these compounds have become associated with multiple adverse effects on human health, including increased cholesterol levels, decreased response to

certain vaccines, increased risk of thyroid disease, reduced fertility in women, and lower infant birth weights.[4]

¶62 Respondents trace the DNR's "policy" concerning PFAS to two sources: (1) an announcement posted on the DNR's website addressing the investigation and cleanup of PFAS which states that "[w]hen discharged to the environment, PFAS compounds meet the definition[] of a hazardous substance … under state statutes" and (2) a statement contained in an August 2020 letter sent by the DNR to all responsible parties that were in the process of remediating a site reminding them "to assess emerging contaminants and their potential impacts as early in the cleanup process as possible" and stating that "[e]merging contaminants discharged to the environment, including certain PFAS, meet the definition of hazardous substance … under WIS. STAT. § 292.01."

¶63 The legal standards governing whether agency pronouncements and actions constitute unpromulgated rules are not in dispute. A rule is "a regulation, standard, statement of policy, or general order of general application that has the force of law and that is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency." WIS. STAT. § 227.01(13). Wisconsin law requires an agency to "promulgate as a rule each statement of general policy and each interpretation of a statute which it specifically adopts to govern its enforcement of

---

[4] In 2016, the Federal Environmental Protection Agency issued an advisory that lifetime exposure to two particular PFAS, known by the abbreviations PFOS and PFOA, in drinking water at a concentration of seventy parts per trillion—the equivalent of three drops in an Olympic-sized swimming pool—would not be expected to cause adverse health effects. In 2022, the EPA revised the health advisory for PFOS and PFOA downward to twenty and four parts per quadrillion, respectively. *See* Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848, 36849 (June 21, 2022), *available at* https://www.govinfo.gov/content/pkg/FR-2022-06-21/pdf/2022-13158.pdf.

that statute." WIS. STAT. § 227.10(1). In contrast, policy statements or interpretations need not go through rulemaking if "made … in an agency decision upon or disposition of a particular matter as applied to a specific set of facts." ***Id.***

¶64 The statements on the DNR website and in the August 2020 reminder letter do not satisfy the definition of a rule in WIS. STAT. § 227.01(13), at a minimum, because they lack the force of law. The majority correctly identifies the standard for when an agency action carries the effect of law but misapplies it to the statements at issue here. *See **Cholvin v. DHFS***, 2008 WI App 127, ¶26, 313 Wis. 2d 749, 758 N.W.2d 118 (stating that agency actions "have the 'effect of law' where criminal or civil sanctions can result [from] a violation; where licensure can be denied, and where the interest of individuals in a class can be legally affected through enforcement of the agency action").

¶65 The statements about the law do not have the force of law because they do not impose any new or unique legal obligations on responsible parties beyond what the Spills Law already requires. Given the important conditional terms that define "hazardous substance," the statements merely alerted LRI and other responsible parties that under the law, PFAS "*may* cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness or … *may* pose a substantial present or *potential* hazard to human health or the environment" given their inherent characteristics, the quantity, concentration, and circumstances surrounding a particular discharge, and the location at which the discharge occurs, including, for example, whether the discharge is in the air, land, or water. *See* WIS. STAT. § 292.01(5) (emphases added). Had the DNR not identified PFAS as hazardous substances in these communications, responsible parties would still be obligated to consider whether the Spills Law is applicable, and if so, to notify the department of discharges of

9

those substances and take necessary actions to restore to the extent practicable, areas affected by the discharges. *See* WIS. STAT. § 292.11(2)(a), (3). Likewise, the civil penalties available under WIS. STAT. § 292.99(1) apply to violations of the notification, remediation, and other obligations imposed by the Spills Law itself, not the DNR's communications reminding responsible parties about the conditional fact- and site-specific definition of hazardous substances and obligations set forth in the law. *See **Service Emps. Int'l Union, Local 1 v. Vos***, 2020 WI 67, ¶102, 393 Wis. 2d 38, 946 N.W.2d 35 (stating that an agency's "communications *about* the law … are not the law itself" because they "impose no obligations, set no standards, and bind no one").[5]

## B. Emerging Contaminants at Certain Concentrations

¶66     Respondents also challenge the DNR's alleged policy of regulating emerging contaminants at certain concentrations. In their appellate brief, Respondents assert that "DNR has adopted specific thresholds for certain substances, the exceedance of which is considered a hazardous-substance discharge." The only example of this alleged policy that Respondents (and the majority) point to appears in a letter sent by the DNR to LRI dated October 28, 2020, in which the department informed LRI that it would need to identify "both the individual and combined exceedances … for PFAS" in future reports regarding LRI's site. The majority asserts that the DNR's requirement that LRI report "exceedances" is evidence of a policy whereby the department has determined the

---

[5] Respondents do not argue that PFAS are not hazardous substances, and the statutory definition of hazardous substance is comprehensive and encompasses substances like PFAS with or without a rule saying so. To the extent that a responsible party disagrees with that assessment as it applies to a discharge resulting in an agency decision or action, a challenge in court would not be based on the DNR's statements about the law in a website post or letter, but the law itself.

concentrations at which certain unidentified emerging contaminants meet the definition of a "hazardous substance." Majority, ¶36.

¶67    I disagree with the majority's reading of the October 2020 letter. To understand why the DNR's statement about "exceedances" in that letter is not reflective of an unpromulgated rule, it is necessary to place the letter in the larger context of LRI's investigation and remediation of its property, which was documented in the parties' pleadings and summary judgment submissions below. In April 2018, LRI notified the DNR of the discharge of a hazardous substance—tetrachloroethylene (PCE), a type of volatile organic compound (VOC)—at LRI's property, on which it had operated a dry cleaning business since 1993. LRI hired a consultant to investigate the extent of the VOC contamination. In November 2018, the consultant submitted a report to the DNR that summarized its investigation and, in LRI's words, "recommended in-situ remediation for addressing the VOC contamination in groundwater."

¶68    Shortly thereafter, LRI applied to enter the DNR's Voluntary Party Liability Exemption (VPLE) program. As described in an affidavit from Darsi Foss, the DNR official who developed the program after its creation in the 1990s, the program "provides responsible or voluntary parties exemption from future environmental liability for historical contamination." Under the department's oversight, participants in the program conduct a DNR-approved environmental investigation of their properties and take steps to remediate the harmful effects of hazardous substance discharges to the extent practicable. At the conclusion of this process, with DNR approval, participants receive a certificate of completion, or COC, that provides certain exemptions from future liability for historical contamination on the property. *See* WIS. STAT. § 292.15.

¶69 Throughout 2019, LRI and its consultant continued the investigation of LRI's property and submitted several reports to the DNR outlining the steps it was taking and making recommendations for remediation. Though LRI continued to focus on VOC contamination, it was required to evaluate and document in its work plans the history of its property, including uses "that may have been associated with" hazardous substance discharges. *See* WIS. ADMIN. CODE §§ NR 716.07(1), 716.09(2)(d) (Apr. 2023). In addition, as a participant in the VPLE program, LRI's investigation and remediation obligations extended to its entire property, not merely the locations in which it had detected PCE.

¶70 In January and February of 2020, LRI's consultant sampled for PFOS and PFOA in several groundwater monitoring wells on its property. In August of that year, the consultant submitted a site investigation work plan to the DNR which included results from the PFOS and PFOA groundwater sampling. In a table attached to the work plan that memorialized the sampling results, LRI listed two groundwater concentration standards[6] each for PFOS and PFOA that had been recommended by the Wisconsin Department of Health Services in 2019.[7] The results showed concentrations of PFOA in three of the four wells from which

---

[6] The two standards were an "Enforcement standard" and a "Preventive action limit," which are "numerical value[s] expressing the concentration of a substance in groundwater." WIS. ADMIN. CODE § NR 140.05(7), (17) (July 2023). On its website, the Department of Health Services describes an enforcement standard as the "[l]evel used to establish limits for discharge to groundwater" and a preventive action limit as the "[l]evel used to trigger actions to prevent additional contamination." *See* Drinking Water: Groundwater Standards, https://www.dhs.wisconsin.gov/water/gws.htm (last revised Feb. 9, 2024). The table attached to the work plan listed an enforcement standard for PFOS and PFOA of twenty nanograms per liter and a preventive action limit for each substance of two nanograms per liter. Nanograms per liter are equivalent to parts per trillion.

[7] At the time, no standards for PFOS and PFOA existed in WIS. ADMIN. CODE ch. NR 140, which specifies groundwater quality standards for certain substances. Thus, according to the DNR project manager assigned to LRI's site, LRI could use the standards recommended by DHS under WIS. ADMIN. CODE § NR 722.09(2)(b)2. (Nov. 2013).

12

samples were taken that exceeded one or both of the DHS standards and concentrations of PFOS in all four wells that exceeded both of the DHS standards.

¶71 In response to the work plan and these results, which showed concentrations of two PFAS in excess of the standards LRI had selected to govern its site, the DNR sent its October 28, 2020 letter conditionally approving LRI's work plan based on, among other things, LRI including "both the individual and combined exceedances … for PFAS" in future reports. Far from reflecting "a regulation, standard, statement of policy, or general order of general application," *see* WIS. STAT. § 227.01(13), the DNR's request that "individual and combined exceedances … for PFAS" be included in future reports was grounded in the particular circumstances of LRI's matter. It was based on specific substances detected in groundwater beneath LRI's property, specific concentrations of those substances detected in the sampling process, and specific concentration standards selected by LRI to govern its remediation efforts. This sort of agency action, in which statutes and regulations are applied to the particular facts of a regulated party's case, "is not required to be promulgated as a rule." *See* WIS. STAT. § 227.10(1).

### C. The Interim Decision on the VPLE Program

¶72 Respondents also challenge the DNR's "interim decision" regarding the VPLE program. As noted above, responsible parties who enter that program are eligible to receive a COC after their investigation and remediation activities are completed. WISCONSIN STAT. § 292.15 authorizes the DNR to issue different types

13

of COCs, including, as relevant here, a "general" COC and a "partial" COC. Sec. 292.15(2)(a), (am). A general COC exempts a responsible party (and future owners of the property) from liability under the Spills Law with respect to all hazardous substances thereafter discovered on the property, even if they were not investigated or remediated while the party was in the program. *See* § 292.15(2)(a). A general COC shifts financial responsibility for cleaning up any subsequently discovered contamination from the party enrolled in the program (and future owners) to other potentially responsible parties or, if none exist, to Wisconsin taxpayers. In contrast, a partial COC provides a more limited exemption from liability that applies only "to the portion of the property or hazardous substances cleaned up." *See* § 292.15(2)(am)1m.

¶73 As detailed in Foss's affidavit, the DNR began evaluating sites in Wisconsin that were undergoing remediation in 2018 for possible PFAS contamination in the wake of spreading awareness about the potential prevalence of those substances in the environment. At that time, according to Foss, remediation efforts had been completed at ten sites in Wisconsin that had been used in industries associated with PFAS use, but at which no testing for PFAS had occurred. A concern arose that if general COCs were issued for these sites, the DNR would be shifting potentially significant financial responsibility for cleaning up PFAS contamination to Wisconsin taxpayers. Ultimately, after multiple meetings over the summer and fall of 2018, the DNR decided to offer partial COCs for these sites if the parties refused to test for PFAS.

¶74 After this decision was made, the DNR prepared a communication for public dissemination explaining the department's authority to issue partial COCs at these sites. This communication, which was made public in a blog post published on January 4, 2019, is the interim decision challenged here. Specifically,

14

Respondents allege that the following two sentences from that blog post constitute an unpromulgated rule:

> The interim decision is to offer a voluntary party a COC for the individual hazardous substances that are investigated after all the VPLE requirements have been met. DNR will not issue a COC that covers all potential hazardous substances, including substances that were not investigated but could be discovered in the future.

¶75 Assuming the majority is correct that Respondents' declaratory judgment claim regarding this pronouncement has not been rendered moot by Foss's sworn statement that it "is no longer a DNR guidance document," the interim decision does not meet the statutory definition of a rule because it is not "a regulation, standard, statement of policy, or general order" that "has the force of law." *See* Wis. Stat. § 227.01(13). The decision did not impose or change any rights or obligations beyond what the Spills Law already provides. It merely informed the public that the DNR would do what the law already allowed it to do: issue partial COCs that provide a liability exemption only with respect to those substances that a party investigates and remediates.

¶76 I agree with the majority's description of the interim decision: it "informs all VPLE program participants that the DNR will not issue a broad COC for general liability protection for substances the party did not investigate during the VPLE program process." Majority, ¶41. But I disagree with the conclusion the majority draws from that informative function. Rather than transforming the decision into a "regulation, standard, statement of policy, or general order," *see* Wis. Stat. § 227.01(13), the informative purpose renders the interim decision more akin to a guidance document in that it simply advised the public how the DNR would implement or apply Wis. Stat. § 292.15. *See* § 227.01(3m)(a)1.-2. (defining "[g]uidance document" as "any formal or official document or communication

15

issued by an agency" that either "[e]xplains the agency's implementation of a statute or rule" it enforces or administers or "[p]rovides guidance or advice with respect to how the agency is likely to apply a statute or rule … if that guidance or advice is likely to apply to a class of persons similarly affected").

## III.

¶77    Because I conclude that none of the DNR statements challenged in this case constitute rules under WIS. STAT. § 227.01(13), I must also address an alternative basis raised in the parties' briefs on which the circuit court's order could be affirmed.  That basis arises under WIS. STAT. § 227.10(2m), which states in relevant part that an agency may not "implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter."  Applying this statute here, Respondents argue that the DNR lacks explicit authority under the Spills Law to regulate emerging contaminants as hazardous substances unless it first promulgates a rule identifying them as hazardous substances.

¶78    Respondents' argument is an awkward fit with the text of WIS. STAT. § 227.10(2m) and the way the Spills Law operates.  Respondents do not question that the Spills Law explicitly empowers the DNR to determine which substances are hazardous.  Instead, they advance the narrower argument that the DNR's "explicit authority" to regulate PFAS arises only *after* promulgating a rule listing PFAS as hazardous substances.  This contention misapprehends the nature of the inquiry under § 227.10(2m).  That statute does not require "explicit authority" to exist for an agency to take action without using a particular tool in its regulatory toolbox—

16

here, promulgating a rule. Indeed, such a reading of the statute would be at odds with our supreme court's recent decisions in *Clean Wisconsin, Inc. v. DNR* (*Clean Wisconsin I*), 2021 WI 71, 398 Wis. 2d 386, 961 N.W.2d 346 and *Clean Wisconsin, Inc. v. DNR* (*Clean Wisconsin II*), 2021 WI 72, 398 Wis. 2d 433, 961 N.W.2d 611.

¶79 In *Clean Wisconsin I*, the court considered whether the DNR had explicit authority to impose animal unit maximum and off-site groundwater monitoring conditions in a Wisconsin Pollutant Discharge Elimination System permit. The court rejected a reading of WIS. STAT. § 227.10(2m)'s "explicit authority" requirement as mandating that the DNR be given express statutory authority to impose those specific permit conditions. Instead, the court held that § 227.10(2m) could be satisfied by "a grant of authority that is explicit but broad." *Clean Wisconsin I*, 398 Wis. 2d 386, ¶24. Similarly, in *Clean Wisconsin II*, 398 Wis. 2d 433, ¶25, the court concluded that the DNR had been conferred explicit authority "to consider the environmental effects of a proposed high capacity well" in statutes that imposed general duties on the DNR to carry out programs to effectuate the purpose of WIS. STAT. ch. 281 and to "'formulate plans and programs' to protect the state's waters."

¶80 Thus, the DNR need not be able to point to a statute or rule that gives it authority to determine a substance to be hazardous for the purpose of WIS. STAT. § 292.01(5) without promulgating a rule. Instead, the relevant inquiry is whether the Spills Law grants it authority—in specific or broad terms—to determine whether a substance is hazardous. The answer to that question is yes. First, the definition of "[h]azardous substance" in § 292.01(5) specifically contemplates the possibility that the DNR will determine substances to be hazardous because it includes within the definition substances that the DNR determines to be "toxic, corrosive, flammable, irritants, strong sensitizers or explosives." In addition, the law charges

17

DNR with ensuring that responsible parties investigate and remediate their properties sufficiently "to restore the environment to the extent practicable" and to minimize a discharge's harmful effects. *See* WIS. STAT. § 292.11(3). If such actions are not carried out, the DNR itself "may identify, locate, monitor, contain, remove or dispose of the hazardous substance." Sec. 292.11(7). To carry out these statutory responsibilities, the DNR must be able to identify substances as hazardous.

¶81    In addition, WIS. STAT. § 292.01(5) sets forth an explicitly broad definition to identify substances that are deemed hazardous under the Spills Law. No language in the definition states or even suggests that determinations of hazardousness must be done through rulemaking. While the DNR may determine a substance is hazardous because of certain inherent characteristics, e.g., toxicity, flammability, etc., those determinations do not define the scope of the term "[h]azardous substance." Rather, the definition sweeps more broadly, using conditional, fact-specific, and self-executing language to trigger the Spills Law's notification, investigation, and remediation obligations. Despite a surfeit of rulemaking requirements for implementation of the Spills Law, there is no requirement that the DNR identify any specific substance as hazardous before the law is triggered.

## IV.

¶82    Given the amount of time and money that can be required to investigate and remediate hazardous substance discharges under the Spills Law, Respondents' desire for the certainty that would come with a rule identifying substances as hazardous is understandable. But that is not the way the Spills Law is structured. The statute defines hazardous substance in broad, fact-specific terms and leaves it to responsible parties, in the first instance, to identify and notify the

18

DNR of discharges of such substances. No provision in the Spills Law requires the DNR to promulgate a rule identifying a substance as a hazardous substance before the law's investigation and remediation obligations apply to it. The majority errs in imposing such a requirement today. I respectfully dissent.